PUBLIC SERVICE COMPANY OF IN-
DIANA, INC., Defendant-Appellant,

v.

Joseph E. GIBBS and Elizabeth Gibbs,
Plaintiffs-Appellees.

No. 2–483A100.

Court of Appeals of Indiana,
Second District.

March 19, 1984.

Rehearing Denied May 2, 1984.

✑105

H. Roy Martin, Martin, Wharry & Disler, Lebanon, Gregory A. Troxell, Plainfield, Lester N. Bergum, Jr., Robison, Robison, Bergum & Johnson, Frankfort, for defendant-appellant.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, George G. Ponton, Frankfort, for plaintiffs-appellees.

ROBERTSON, Judge (Writing by Designation).

Public Service Company of Indiana, Inc. (PSI) appeals the trial court's judgment awarding $605,498.87 to the plaintiff-appellee, Joseph E. Gibbs (Gibbs), and $15,000 to his wife, Elizabeth. PSI neither challenges the proceedings before the trial court nor the determination that it breached its duty of care, but contends it is entitled to a judgment as a matter of law because of the doctrines of contributory negligence and incurred risk.

We affirm.

■ PSI concedes it had the burden of proof to establish Gibbs was contributorily negligent or that he incurred the risk of his injuries. *Hi-Speed Auto Wash, Inc. v. Simeri*, (1976) 169 Ind.App. 116, 346 N.E.2d 607. Thus, PSI is appealing negative judgments in this case. In reviewing negative judgments, this court will only consider the evidence most favorable to the appellee, together with all reasonable inferences to be drawn therefrom. It is only where the evidence leads to but one conclusion and the trial court has reached the opposite result that the decisions will be reversed as being contrary to law. *Chaney v. Tingley*, (1977) 174 Ind.App. 191, 366 N.E.2d 707.

The facts reveal that Gibbs was the manager of the International Mineral and Chemical Corporation (IMC) fertilizer plant in Forest, Indiana. Gibbs suffered severe electrical shock when one of the bins of a fertilizer hopper truck he was operating came into contact with a 7200 volt uninsulated power line on April 23, 1979. The accident took place during the ten day period of spring planting in which seventy-five percent of IMC's annual business transactions occur. Gibbs is permanently disabled as a result of the accident.

Gibbs was operating a Mobility hopper truck when the accident occurred. The truck consists of a hopper unit, manufactured by Mobility, attached to the flat bed of a Ford truck. The hopper unit has two large fertilizer bins. The truck with the hoppers unelevated is approximately twelve feet high. To operate the truck, it is first necessary to fill the hopper with fertilizer and then pull beside a fertilizer spreader truck, which is referred to as a flagship. At this time, the operator would get out of the truck and lower two outriggers or stabilizers, which are iron supports extending from the left side of the truck bed to prevent the vehicle from tipping when the hoppers are unloading. One of the hoppers would then be hydraulicly raised and the fertilizer is dumped into the flagship. In its elevated position, the top of the hopper box tilts upward at a slight angle.

The accident took place at the IMC fertilizer plant. PSI owns and maintains primary electrical distribution lines which are parallel to the county line road. The road runs to the northeast out of Forest and fronts the eastern edge of the IMC property. The electricity is carried by an open delta system which consists of three lines. The two outside lines are energized or "hot" and carry 7200 volts each. The mid-

dle line is not energized. These lines run generally in a northwesterly to southeasterly direction into a transformer on IMC's property. Various service lines run from the transformer to the buildings on the plant. The high voltage lines pass over the rectangular scales which IMC uses to weigh trucks. The power lines are attached to a thirty-five feet high utility pole to the east and to a pole forty feet high to the west. The poles are two hundred sixty-eight feet apart, even though the specifications for the job call for a span of two hundred fifty feet. The wires are attached to cross-arms which are twenty-seven feet, six inches in height on the east pole and thirty-one feet, six inches on the west pole. The minimum vertical height for a span of this distance is twenty feet, eleven inches and it is imposed by the National Electrical Safety Code. The parties stipulated that the code is applicable to PSI.

The accident occurred on April 23, 1979, at approximately 5:30 p.m. at a point about thirty feet southeast of the scales. James Richter was operating the flagship that day. He had been called on a two-way radio and told to return in order to save time. When Richter returned, Gibbs pulled beside him in the hopper truck. The hopper truck was facing east and the flagship was headed west such that the left sides of the vehicles were opposite each other. The flagship was approximately two feet further north than the hopper truck. The large flotation tires of the flagship allowed only six inches of space at the point where Gibbs would operate the hopper controls.

After briefly conversing with Richter, Gibbs got out of his vehicle and walked to the left front of the flatbed where the operating controls for the hopper were located. Gibbs testified that he looked up and could not see anything. Other employees testified that one could not see above the hopper. There was also testimony that an operator would look away to avoid having fertilizer dust get into his eyes. Gibbs lowered the stabilizers and began to raise the front hopper in order to dump its contents. When the hopper was near or at its maximum height, it came into contact with its northern primary line. The evidence established the maximum height of the hopper truck to be twenty feet, one and one half inches, but it contained a ladder which could increase its height by one inch. The importance of the ladder is insignificant because testimony established contact was made about eight to ten inches below the highest point of the hopper. The trial court also found that no arcing had taken place but that actual contact had occurred.

On April 27, 1978, approximately one year prior to the accident, IMC called PSI to lower the lines temporarily in order for IMC to install a new set of scales. Gibbs was present when the lines were lowered and he noticed burn marks on the wires. The PSI employees informed him that the burns were caused by lightning. The wires were repaired by splicing the old wires and inserting new sections of wire to replace the burned segments. There was also evidence presented that splicing wires could alter the overall height of power lines. The PSI employees noticed that a guy wire to one of the utility poles had been struck by something, which could also decrease the vertical clearance of the lines. The employees failed to report the loose guy wire or the burn marks to PSI. After raising the lines, the employees did not measure the lines even though the evidence showed that it was a very simple procedure and the employees were furnished a measuring device.

Previously in 1977, a safety inspection of the plant was conducted by Mr. Feagin, an executive with IMC. After his inspection, Feagin wrote to Gibbs with safety instructions, one of which provided:

> Post sign above scale warning drivers of dump trucks of overhead company wires. These are about twenty-five feet high and cannot be relocated.

Feagin was shown all of IMC's equipment including a McCrab hopper which could extend higher than the Mobility hopper, yet the warning was limited to dump trucks and was intended for customers of IMC because IMC did not have any dump trucks

at this plant. As a result of the inspection, a sign was placed outside on the office wall stating: "low hanging wires". Gibbs and other IMC employees testified that they believed the sign pertained to the low hanging insulated service or secondary lines which ran from the transformer to other buildings. Other testimony established that the lines which electrocuted Gibbs were not considered low hanging wires.

PSI presented evidence that other IMC employees had never operated a hopper truck at the accident site. There was testimony that the McCrab hopper had been used all over the plant. The evidence also showed the Mobility hopper contained two warning stickers. The first label is black and white warning label with a cross-hatch border divided into two columns. The second column states in large letters: "BE CAREFUL". Item number two under this column states: "Look up before raising box, power lines may be overhead".

PSI raises three issues in its appeal. It alleges that Gibbs was contributorily negligent as a matter of law, that he incurred the risks of his injuries, and that the trial court utilized two different standards in determining negligence and contributory negligence.

■■■ Contributory negligence has been defined as the failure of a person to exercise that degree of care and caution for his own safety which an ordinary reasonable and prudent person in similar situations would exercise. *Kroger Co. v. Haun,* (1978) 177 Ind.App. 403, 379 N.E.2d 1004. Lack of reasonable care that an ordinary man would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends. It must be further shown that the plaintiff's negligent act was a proximate cause of his injury and that he was actually aware of or should have appreciated the risks involved. *Hundt v. La Crosse Grain Co., Inc.,* (1983) Ind., 446 N.E.2d 327. The question of contributory negligence is one of fact for the jury when the evidence is in dispute or conflicting, or is such that different minds may reasonably draw different

conclusions or inferences therefrom. However, where but one reasonable conclusion or inference can be drawn from the evidence, the question of contributory negligence becomes a question of law. *New York Central Railroad Co. v. Glad,* (1962) 242 Ind. 450, 179 N.E.2d 571.

PSI argues Gibbs was contributorily negligent as a matter of law because Gibbs testified that he had observed the power lines for approximately nine years and knew their general location, that he should have heeded the warnings on the hopper truck, that there were other safer areas on the plant's premises, and that he had conducted safety meetings where he instructed IMC employees. PSI also contends Gibbs was negligent because his view of the wires was blocked by the hoppers and he could have moved to a position where he could see clearly.

■■■ There was also evidence introduced showing that the lines in question were not considered to be low hanging wires. It was also established that the IMC employees including Gibbs thought the height of the wires was twenty-five feet and that this information came from PSI. An internal memorandum to this effect from Gibbs's supervisor was submitted. The memorandum instructed Gibbs to warn dump trucks with substantially greater vertical clearance requirements. Another hopper truck with greater clearance had been used "all over" the plant with no accidents. Gibbs testified that he had looked up and did not see the wires. The evidence also showed there was only six inches of work space because of the close proximity of the vehicles. PSI's argument is merely an invitation to reweigh conflicting evidence as to whether Gibbs exercised reasonable care which our standard of review regarding negative judgments mandates a refusal. There was substantial evidence to support a finding that Gibbs acted reasonably to protect himself and his belief that the wires were twenty-five feet high was reasonable.

■■■ PSI's next argument is that Gibbs incurred the risk of his injuries. The doc-

trine of incurred risk is based upon the proposition that one incurs all the ordinary and usual risks of an act upon which the actor voluntarily enters, so long as those risks are known and understood by the actor. Incurred risk demands a subjective inquiry into the particular actor's knowledge and voluntary acceptance of the risk. *Kroger Co. v. Haun, supra.* In the present case, the evidence most favorable to the judgment does not support a finding of incurred risk because it shows Gibbs was unaware the power lines were overhead and there is no evidence to support a finding that he voluntarily encountered the risk of his injuries.

■ PSI alleges that the trial court erred by employing different standards in determining that PSI was negligent and that Gibbs was not contributorily negligent. PSI correctly asserts that contributory negligence is to be determined and governed by the same standards, tests, and rules as those employed for determining the negligence of the defendant. *Cartwright v. Harris,* (1980) Ind.App., 400 N.E.2d 1192. PSI argues different standards were employed because Gibbs could have measured the height of the lines and in failing to determine the power lines were not in compliance with the National Electrical Safety Code. This argument is another invitation to reweigh the evidence and an attempt by PSI to shift its duties to Gibbs. There was substantial evidence showing Gibbs had acted in a reasonable and prudent fashion to protect himself.

The judgment is affirmed.

BUCHANAN, C.J., concurs.

SHIELDS, J., concurs in result.