**Mary A. CLEM, Personal Representative of the Estate of Cary Lee Clem, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. S 83–430.**

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 29, 1985.

Gerald A. Kamm, South Bend, Ind., Robert L. Dalmbert, Columbus, Ind., for plaintiff.

R. Lawrence Steele, Jr., U.S. Atty., Donald P. Moroz, Asst. U.S. Atty., South Bend, Ind., Patrick O. Cavanaugh, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP; Chief Judge.

This case is an action under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. filed by plaintiff to recover damages from the United States for the wrongful death of her husband while at the Indiana Dunes National Lakeshore Park. This matter was tried by the court without a jury on November 29, 1984 and the parties were given until December 10, 1984 to file final memoranda in support of their positions. Because of the difficult legal questions presented in this case, further oral argument was held in this case on December 21, 1984 and the matter was taken under ad-

visement. The parties were given until January 7, 1985 to file supplemental briefs which they have done. This Memorandum and Order contains the findings of fact and conclusions of law thereon pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

On July 28, 1982, Mr. and Mrs. Clem and their daughter visited the Indiana Dune National Lakeshore Park (Park) in Northwest Indiana. The Park is located on property owned by the United States of America and is operated under the auspices of the National Park Service of the Department of the Interior (NPS). The authorized boundary of the Park consisted of approximately 13,000 acres maintained by approximately 50 employees of the federal government. The Clems were not required to pay any type of fee in gaining admission to the Park and its various facilities.

Shortly after their arrival at the Park at approximately 11:00 to 11:30 A.M. on July 28, 1982, the Clems went to the Park's Visitor Center, to which they were directed by various signs located both within and outside the authorized boundary of the Park. At the Visitors Center, Mr. Clem picked up a brochure, which included a map of the Park, and he and Mrs. Clem viewed a film which described the environs of the Park and its activities. The film also contained a safety message about swimming in Lake Michigan. The brochure/map that the decedent obtained and reviewed on July 28, 1982 (Plaintiff's Exhibit 39), is only available from the NPS upon request. The map depicted in the brochure indicated which beaches were under the supervision of lifeguards. The brochure also contained the following written provisions:

*Swimming.* Beaches with parking are at West Beach (parking fee in summer), Kemil Road, Central Avenue, and Mt. Baldy. Be careful—Lake Michigan waters can be treacherous. Lifeguards work West Beach and Kemil Road during summer. West Beach has showers, bathrooms, and concessions. The others have portable toilets (no water).

The best place to begin your visit to the Lakeshore is at its *Visitor Center* 5 kilometers (3 miles) east of Indiana 49 on U.S. 12 at Kemil Road. Here you find information, maps, public telephones, activity schedule and free "Singing Sands Almanac" newspaper, an auditorium slide and tape program, book store, library, and a short loop nature trail through wooded dunes. Open daily except on December 25, January 1 and Thanksgiving.

*Park Rangers.* Rangers are on duty to help you enjoy yourself and to help protect both you and the lakeshore; ranger stations are shown on the map.

Mr. and Mrs. Clem decided to visit Mt. Baldy because it was the largest dune in the Park, to explore the dunes and beach area. Mt. Baldy is a sand dune located in the extreme eastern section of the Park. Nearby is one of five beaches located on land adjacent to Lake Michigan and was and is within the authorized boundary of the Park. Only two of the five beaches, West Beach and Kemil Road, were guarded beaches in the Summer of 1982. Mt. Baldy was, and remains, an unguarded beach area pursuant to the Indiana Dunes General Management Plan of 1980.

At approximately 1:15 P.M. on July 28, 1982, the Clems arrived at Mt. Baldy and noticed a sign posted near the parking lot entrance which contained, along with other information, the following language "Use caution-Lifeguards not Provided." Father Raymond Schulte, a Roman Catholic Priest, who often swam at Mt. Baldy, testified with respect to the sign as follows:

Q. What does the term "use caution" mean to you, Father?

A. I would say not go out over your head.

Q. How about—what does it mean when it says "Lifeguard not provided" to you?

A. Kind of swimming at your own risk.

After discussing the significance and the meaning of this sign, the Clems proceeded

to the beach area where they observed 40 or 50 people in the water and on the beach. The Clems did not notice any signs on the beach advising them of existing water conditions or prohibiting swimming.

Shortly after 1:30 P.M., Mr. and Mrs. Clem and their daughter entered the waters of Lake Michigan for the first time. They had never been to the Park before and none of them had ever before been swimming in Lake Michigan. The waves at this time were between 2 and 4½ feet in height, with an undertow condition present. Mr. Clem proceeded to go out swimming past the sandbar and after a while he came back to his wife and daughter. At that time, Mrs. Clem proceeded out to the sandbar. When she attempted to swim back to shore but was unable to make any progress, she called for assistance. Her husband and another young man attempted to assist her but their efforts were ineffective. Father Schulte and his friend who were swimming on the sandbar approximately 40 yards from shore, heard shouting and proceeded out deeper to assist the Clems who were another 40 to 50 yards out further from shore. Father Schulte and his friend found they could not help them and swam back to the sandbar and shouted for help. Some additional people from shore brought inner tubes out to assist. Mrs. Clem eventually got to shore but her husband was caught in the undertow and drowned. Mr. Clem was pronounced dead shortly after the resuscitation efforts of other swimmers and Michigan City medical technicians proved unsuccessful.

In July of 1982, the Park employed beach and parking lot attendants, maintenance personnel and Park technicians, commonly referred to as rangers. On July 28, 1982, two rangers were assigned to patrol the Eastern District of the Park. In addition to patrol, they also had a multitude of other tasks to perform. All staffing and personnel decisions which relate to this case were made by the office of the Chief Ranger acting under the authority of the Park's Superintendent. Funding for the Park's operations stem directly from congressional appropriations allotted to the Department of the Interior. It is within the funding constraints imposed by Congress that the Park must operate.

The Park maintained a radio communication system so that lifeguards, rangers and various stations, including the "Visitor Center", could be kept up-to-date on current events. Shortly after 10:00 A.M., the West District, which was a guarded beach, radioed to the Dispatcher that the beach was closed because of a bad undertow. The East District lifeguard at Kemil Road Beach also notified the Dispatcher that they had closed the beach because of bad undertow shortly after 10:00 A.M.

It was the unwritten policy of the Park in July of 1982 for rangers to check all easily accessible beaches, including Mt. Baldy Beach so as to warn swimmers of dangerous conditions that were known. On July 28, 1982 various park rangers, after being advised of the guarded beaches being closed for swimming because of the bad undertow proceeded to follow the Park policy and notify individuals using the unguarded beaches of the danger of strong undertow.

The plaintiff, Mrs. Clem, prior to instituting this lawsuit, filed a claim for wrongful death of Cary Lee Clem with the United States of America, Department of the Interior, National Park Services. Said claim was denied by defendant. At the time of his death, Mr. Clem was 35 years old and was employed by Reliance Electric in a supervisory capacity.

## II. CONCLUSIONS OF LAW

■ The Federal Tort Claims Act (F.T.C. A.), 28 U.S.C. § 1346(b), 2671 et seq., constitutes a limited waiver of the United States' sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). In conferring jurisdiction on federal district courts with respect to tort claims against the government, 28 U.S.C. § 1346(b) specifically provides:

[T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act of omission occurred.

This section, in conjunction with 28 U.S.C. § 2674 permits the United States to be held liable only in the same manner and to the same extent as a private individual would be under similar circumstances. *See Rayonier v. United States*, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957); *see also Proud v. United States*, 723 F.2d 705, 706 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). Since the alleged negligent acts and omissions of the NPS occurred in Indiana, the United States' liability is governed by the substantive law of that state.

■ In order to recover in a negligence action under Indiana law, the plaintiff must prove, by a preponderance of the evidence three elements: (1) a duty on the part of the defendant in relation to plaintiff; (2) failure on the part of the defendant to conform its conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure. *Miller v. Griesel*, 261 Ind. 604, 610–11, 308 N.E.2d 701 (1974); *Great Atlantic and Pacific Tea Co., Inc. v. Wilson*, 408 N.E.2d 144 (Ind.App.1980); *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858 (1978); *City of Indianapolis v. Parker*, 427 N.E.2d 456 (Ind.App. 1981). At the end of the presentation of plaintiff's evidence in this case, the defendant moved, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for dismissal of this case on the ground that plaintiff had failed to demonstrate any right to relief for several reasons, namely:

1. As landowner of the Indiana Dunes National Lakeshore Park, the United States is entitled to the immunity provided by I.C. § 14–2–6–3, inasmuch as the decedent was gratuitously engaged in a recreational activity at the time of the subject incident;

2. The purportedly negligent acts and omissions of the National Park Service, which serve as the principal bases for plaintiffs' case, are shielded by the discretionary function exception to the F.T.C.A. Specifically, the decisions of the National Park Service to issue or not issue warnings pertaining to the conditions of Lake Michigan, the content of the signs posted at the Mt. Baldy area, and the decisions to provide lifeguards and rescue equipment only at a limited number of designated beach areas all constitute discretionary acts within the meaning of 28 U.S.C. § 2680(a);

3. The United States did not breach an actionable duty owed to the plaintiff's decedent so as to render it negligent;

4. Even if the defendant was negligent, there has been no showing that such negligence was the proximate cause of plaintiff's decedent's death;

5. The decedent voluntarily assumed any risks incident to swimming in Lake Michigan off the shores of an unguarded beach area; and

6. The decedent was contributorily negligent in his drowning death.

The court overruled defendant's motion for dismissal at that time. The defendant renewed its motion at the close of all the evidence on the same grounds and the court reserved ruling thereon. The issues presented by defendant will be addressed separately.

## A. INDIANA RECREATIONAL USE STATUTE

■ Indiana Code Section 14–2–6–3 provides as follows:

Any person who goes upon or through the premises including, but not as a limitation, lands, caves, waters, and private ways of another with or without permission to hunt, fish, swim, trap, camp, hike,

sightsee, or for any other purposes, without the payment of monetary consideration, or with the payment of monetary consideration directly or indirectly on his behalf by an agency of the state or federal government, is not thereby entitled to any assurance· that the premises are safe for such purpose. The owner of such premises does not assume responsibility for nor incur liability for any injury to person or property caused by an act or failure to act of other persons using such premises. The provisions of this section shall not be construed as affecting the existing case law of Indiana of liability of owners or possessors of premises with respect to business invitees in commercial establishments nor to invited guests nor shall this section be construed as to affect the attractive nuisance doctrine. Nothing in this section contained shall excuse the owner or occupant of premises from liability for injury to persons or property caused by the malicious or illegal acts of the owner or occupant.[1]

The Indiana legislature's reason for enacting this statute is apparent: to encourage landowners to open their property to the public for recreational purposes free of charge, which purpose must be borne in mind when construing a statute so as to avoid negation of the legislature's intent. *See Schwartz v. Zent,* 448 N.E.2d 38 (Ind. App.1983). In *Schwartz,* the Indiana Court of Appeals acknowledged that in the absence of ambiguity, the court was compelled to "give effect to the plain meaning of the language employed by the legislature." *Id.* at 39. Accordingly, the Court of Appeals declined the invitation to narrowly construe the statute, which foretells the Indiana courts' intention to broadly

construe I.C. § 14–2–6–3 in order to fully effectuate its purpose.

In the case presently before the court, the evidence clearly establishes that the Clems were swimming in Lake Michigan in an area adjacent to Mt. Baldy beach at the time of the incident. As such, they were engaged in ·an activity explicitly covered by the statute. Second, assuming without deciding that the United States was the owner of the property for the purpose of deciding this issue,[2] the only issue remaining is whether any of the exceptions stated in the statute are applicable in this case.

The Clems paid no admission fee nor was one paid on their behalf, in gaining access to the Park or to its various facilities. Thus, no economic benefit was derived by the federal government so as to trigger operation of the statute's consideration exception. Further, there is no issue involving an attractive nuisance nor allegations by the plaintiff that the alleged injury was caused by any malicious or illegal acts of the· federal government.[3] Accordingly, if the Clems were to come within any exception contained in the statute, it would have to be with respect to Indiana case law relating to business invitees in commercial establishments or invited guests. The plaintiff basically concedes that the business invitee in commercial establishment exception does not apply but maintains that the invited guest exception is applicable.

Under Indiana law, a person entering upon the land of another comes on to the land either as an invitee, a licensee or a trespasser. *Barbre v. Indianapolis Water Co.,* 400 N.E.2d 1142, 1145 (Ind.App. 1980). An invitee is a person who goes on to the land of another at the express or

---

1. This court notes that I.C. § 14–2–6–3 was amended by the Indiana legislature in 1983. However, the changes made were merely grammatical and did not change the substance of the statute.

2. Although this court assumed for purposes of this decision that the United States was the owner of the property, such an assumption could be questioned in light of the Submerged

Lands Act, 43 U.S.C. § 1301 et seq. *See Garner v. City of Michigan City,* 453 F.Supp. 33 (N.D. Ind.1978).

3. Although the plaintiff has attempted to argue in one of her briefs that the defendant acted maliciously toward plaintiff in this case, the record contains no allegations nor evidence of any such conduct on the part of the defendant.

implied invitation of the owner or occupant either to transact business or for the mutual benefit of the invitee and the owner or occupant. *Id.* at 1146; *Hammond v. Allegretti,* 262 Ind. 82, 311 N.E.2d 821 (1974); *Mullins v. Easton,* 176 Ind.App. 590, 376 N.E.2d 1178 (1978); *Verplank v. Commercial Bank,* 145 Ind.App. 324, 251 N.E.2d 52 (1969). A licensee is one who enters the premises of another for his own convenience, curiosity or entertainment. *Barbre v. Indianapolis Water Co.,* 400 N.E.2d at 1146; *Xaver v. Blazak,* 181 Ind.App. 245, 391 N.E.2d 653 (1979); *Pierce v. Walters,* 152 Ind.App. 321, 283 N.E.2d 560 (1972). Inasmuch as the parties basically agree that the Clems were not trespassers, this court must determine which of the two categories defined above encompasses the status of the Clems on July 28, 1982 and how that status relates to the Indiana statute in question.

In support of the position that the Clems were "invited guests" of the Park, the plaintiff cites several cases involving premises upon which public entertainment was involved in which the courts found that the users of such premises were invitees. *See, e.g., Bearman v. University of Notre Dame,* 453 N.E.2d 1196 (Ind.App.1983); *Rouch v. Bisig,* 147 Ind.App. 142, 258 N.E.2d 883 (1970); *Pfisterer v. Grisham,* 137 Ind.App. 565, 210 N.E.2d 75 (1965). A review of those cases, however, clearly indicates that the presence on the premises of the individuals involved arose out of a business purpose and the determination of whether they were invitees or licensees did not arise.

■ The evidence in the case presently before the court clearly indicates that the Clems were licensees, not invitees. The Clems entered the Park and used the facilities there for their own entertainment. They were not on the Park's premises to transact business, do some act to benefit the NPS nor do some act that was a mutual benefit to them and the NPS. Although the plaintiff argues that an implied invitation arose due to the acts and conduct of the NPS, including the facts that the Park

was maintained for the use of the public, the Park maintained a Visitors Center, employed rangers, posted various directional signs and maintained parking lots and toilet facilities, these facts do not constitute an "implied invitation" within the meaning of invitee. 21 I.L.E. *Negligence* § 33, p. 290. Rather, the Clems' presence on the premises of the Park, if by "implied invitation" was more in the nature of a social guest which under Indiana law has only the rights of a licensee, not an invitee. *See, e.g., Mullins v. Easton,* 176 Ind.App. 590, 376 N.E.2d 1178 (1978). Accordingly, the Clems had the status of licensee under Indiana law.

The last issue with respect to the application of I.C. § 14-2-6-3 to this case is whether the Clems status as licensee comes within the "invited guest" exception of the statute. As indicated above, Indiana law basically recognizes three categories of persons entering upon the premises of another: invitee, licensee and trespasser. The Indiana legislature, however, used the terms "business invitees in commercial establishments" and "invited guests" in defining exceptions to the statute. Although the business invitee exception clearly falls within the invitee classification under Indiana law, this court must determine what the legislature meant by "invited guest."

■ The courts in Indiana have not construed the statutory provision in question nor can this court find any Indiana case law interpreting or defining the term "invited guest." This court must therefore attempt to determine what the term "invited guest" means under Indiana law. In light of the broad interpretation of the statute in *Schwartz v. Zent, supra,* and the underlying policy of the statute, this court finds that the Indiana legislature did not mean to create a broad exception by using the term "invited guest", but rather intended the exception to apply to only those included in the invitee category under Indiana law. The Clems do not fall within the traditional notion of invitee, and this court does not construe the statute to include a licensee within the exception. Accordingly,

I.C. § 14–2–6–3 constitutes a *prima facie* defense and bars any recovery by the plaintiff in this action.

## B. BREACH OF DUTY

 As shown in the previous section hereof, the Clems entered the Park as licensees. As such, they took the land as they found it and cannot hold the owner thereof liable for any defects in the condition of the land. The only affirmative duty a land owner owes to a licensee is to refrain from wilfully or wantonly injuring him or acting in a way which would increase the licensee's peril. A showing by the licensee of mere negligence on the part of the land owner will not be enough to insure him recovery. *Barbre v. Indianapolis Water Co.,* 400 N.E.2d at 1146; *see e.g., Xaver v. Blazak,* 181 Ind.App. 245, 391 N.E.2d 653 (1979); *Pierce v. Walters,* 152 Ind.App. 321, 283 N.E.2d 560 (1972); *Fort Wayne National Bank v. Doctor,* 149 Ind.App. 365, 272 N.E.2d 876 (1971).

 In the case presently before the court, there are no allegations nor any evidence that Mr. Clem's death was caused by any wilful or wanton act of the NPS. Rather, the evidence showed that Mr. Clem's death was caused by drowning while swimming in Lake Michigan. Thus, even assuming the NPS was negligent in some way, the NPS did not breach any duty owed to the Clems as a matter of law and plaintiff cannot recover for the death of Mr. Clem against the NPS.

**4.** In 1983, the Indiana General Assembly adopted a comparative fault statute, I.C. 34–4–33–1 et seq. which became effective on January 1, 1985. That statute, however, cannot be applied retroactively and this case must be decided under the law as it existed in July 1982.

**5.** The plaintiff argues that the failure of the NPS to specifically warn them of the undertow condition existing in Lake Michigan on July 28, 1982 was prima facie negligence on their part and cites *Davis v. United States,* 716 F.2d 418 (7th Cir.1983) in support thereof. That case, however, was decided under Illinois law, not Indiana law which is controlling in this case.

## C. CONTRIBUTORY NEGLIGENCE

 Under Indiana law, contributory negligence is a complete defense [4], *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 967 (7th Cir.1983); *see Koroniotis v. LaPorte Transit, Inc.,* 397 N.E.2d 656, 660 (Ind.App.1979), and is defined as,

the failure of a person to exercise for his own safety that degree of care and caution which an ordinary reasonable and prudent person in a similar situation would exercise.

*Kroger Co. v. Haun,* 177 Ind.App. 403, 379 N.E.2d 1004, 1007 (1978). Further, the basis of the contributory negligence doctrine is the assumption that negligence charged against the other party is admitted or established by proof. 21 I.L.E. *Negligence* § 81, p. 337. The question of contributory negligence is to be determined and governed by the same objective standards, tests and rules as are employed for determining the negligence of a defendant. *See Cartwright v. Harris,* 400 N.E.2d 1192, 1194 (Ind.App.1980); *Kroger Co. v. Haun, supra.* Thus, if decedent's actions in this case were unreasonable under the circumstances so as to constitute lack of ordinary care, and contributed to his death to any degree, the plaintiff is barred from recovery. *See, Koroniotis v. LaPorte Transit, Inc.,* 397 N.E.2d at 660.[5]

 The standard of care which Mr. Clem was bound to exercise in regard to his own contributory negligence is reasonable care for a person of like age, intelligence and experience under similar circumstances. *Rouch v. Bisig,* 147 Ind.App. 142, 258 N.E.2d 883, 889 (1970). In this case,

In Illinois, the law of comparative negligence is applicable whereas in Indiana, the doctrine of contributory negligence was applicable. Second, although the issue of whether the warning was sufficient is common to both cases, the nature of the allegedly undisclosed danger is quite different. An undertow or rip current can occur at any time anywhere in the lake whereas the location of the rocks as in *Davis* was constant. Therefore, the type of warning necessary may be different. This court is not required, however, to decide this issue or whether the discretionary function exception of the F.T.C.A. applies here.

the similar circumstances include the dangers inherent in bodies of water which under Indiana law, even young children are presumed to understand and appreciate. *See, e.g., Martin v. Shea,* 463 N.E.2d 1092 (Ind.1984); *Barbre v. Indianapolis Water Co.,* 400 N.E.2d at 1146.

The evidence in this case reveals that Mr. Clem was 35 years old at the time of the incident and was employed in a supervisory capacity at Reliance Electric. Mr. Clem reviewed a brochure provided by the NPS which advised him that the waters of Lake Michigan could be treacherous and also saw a film which contained a safety message pertaining to swimming. The brochure further informed him as to which of the beach areas were guarded and which ones were not. When the Clems arrived at the Mt. Baldy area, they encountered a sign which read "Use caution-Lifeguards not Provided," which sign they read and discussed. Nevertheless, they proceeded over the hill to the beach area to swim even though they were relatively inexperienced swimmers and had never swam in Lake Michigan and thus were not familiar with natural propensities such as undertow of a large body of water.

Based on this evidence, the court finds that Mr. Clem did not exercise reasonable care for a person of like age, intelligence and experience under similar circumstances, and thus was contributorily negligent. Although Mr. Clem may not have known of the specific danger of undertow on July 28, 1982, a person of like age, intelligence and experience, or lack thereof with respect to large bodies of water, exercising reasonable care would not have gone swimming at Mt. Baldy, an unguarded area.

### D. INCURRED RISK

Incurred risk is a defense to a claim of negligence separate and distinct from the defense of contributory negligence and is based upon the proposition that one incurs all the ordinary and usual risks of an act upon which the actor voluntarily enters, so long as those risks are known and understood by the actor. *Pub-*

*lic Service Co. of Indiana, Inc. v. Gibbs,* 460 N.E.2d 992, 996 (Ind.App.1984); *Power v. Brodie,* 460 N.E.2d 1241, 1242 (Ind.App. 1984). As stated by the court in *Power,* incurred risk

> involves a mental state of venturousness on the part of the actor, *Gates v. Rosenogle,* (1983) Ind.App., 452 N.E.2d 467, 473; *Colaw v. Nicholson,* (1983) Ind.App., 450 N.E.2d 1023, 1029; *Kroger,* 177 Ind.App. at 409, 379 N.E.2d at 1009, and demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk, *Gates,* 452 N.E.2d at 473; *Colaw,* 450 N.E.2d at 1029; *Antcliff v. Datzman,* (1982) Ind.App., 436 N.E.2d 114, 120, *trans. denied; Moore v. Moriarty,* (1981) Ind.App., 415 N.E.2d 779, 782; *Kroger,* 177 Ind.App. at 409, 379 N.E.2d at 1008. "By definition ... the very essence of incurred risk is the conscious, deliberate and intentional embarkation upon a course of conduct with knowledge of the circumstances...." *Gerrish v. Brewer,* (1979) Ind.App., 398 N.E.2d 1298, 1301. "It requires much more than the general awareness of a potential for mishap. Incurred risk contemplates acceptance of a specific risk[3] of which the plaintiff has *actual* knowledge." *Colaw,* 450 N.E.2d at 1029 (emphasis supplied). While the failure to recognize a danger or risk readily discernible to the reasonable and prudent man under like or similar circumstances may constitute contributory negligence, it cannot be said to constitute incurred risk because "it should *never* be considered a voluntary incurrence of a *known* risk." *Kroger,* 177 Ind.App. at 410, 379 N.E.2d at 1009 (emphasis supplied); ("to hold that one may voluntarily incur a risk of which he had no actual knowledge, yet was *required* to know in the exercise of ordinary care, is a perversion of the doctrine.")

3. A specific risk involves only the ordinary and usual risks inherent in a given act. *Kroger,* 177 Ind.App. at 408, 379 N.E.2d at 1008, quoting *Stallings v. Dick,* (1965), 139 Ind.App. 118,

129, 210 N.E.2d 82, 88, *trans. denied* (1966).

460 N.E.2d at 1243.

In the case presently before the court, the application of the incurred risk doctrine depends upon a determination of what the risk was. The plaintiff argues that the Clems did not know about the undertow condition and therefore did not have knowledge and understanding of the risk. The risk in this case, however, is much broader than that. The Clems made a conscious, deliberate and voluntary decision to go swimming in Lake Michigan at Mt. Baldy Beach, an unguarded beach. They had been warned that the waters of Lake Michigan could be treacherous and had viewed a film which contained a safety message about swimming in the Lake. They had read and discussed a sign that clearly stated that no lifeguards were on duty and thus were aware that no professional help was provided in the event that they encountered trouble. Under Indiana law, one of the recognized risks of swimming, particularly in a large body of unfamiliar water of unknown propensities, is drowning. *See Martin v. Shea,* 463 N.E.2d 1092 (Ind.1984); *Crist, Inc. v. Whitacre,* 147 Ind.App. 16, 258 N.E.2d 165, 168 (1970). Added to this knowledge on the part of the Clems is the additional knowledge they had, and thus the acceptance of the risk that the waters could be treacherous, even though they may not have known every aspect that made them so as well as the risks inherent in swimming at an unguarded beach. Accordingly, the doctrine of incurred risk applies and prevents recovery by plaintiff in this action.

This is a case where the human heart strings pull in one direction and the law compels a contrary conclusion. Juries are always told that sympathy cannot be the basis of a decision. The same idea must apply to cases tried by a court without a jury.

## CONCLUSION

For the foregoing reasons, defendant's Trial Rule 41(B) motion for dismissal is hereby GRANTED. SO ORDERED.