PALACE BAR, INC., AN INDIANA CORPORATION; HERMAN WALTERS AND RUTH WALTERS, D/B/A THE PALACE BAR AND NELL LYNN *v.* ROSETTA FEARNOT, AS SURVIVING SPOUSE AND ADMINISTRATRIX OF THE ESTATE OF GARLEN FEARNOT, DECEASED.

[No. 1078S222. Filed October 12, 1978.]

*Eric A. Frey, Rosenfeld, Wolfe, Frey & Lowery,* of Terre Haute, *Harold A. Harrell,* of Bloomington, *Gus Sacopulos,* of Terre Haute, for appellants.

*Walter E. Bravard, Jr., Dean E. Richards, Richards, Bennett & Bravard,* of Indianapolis, for appellee.

PIVARNIK, J.—This cause comes to on petition to transfer from the Court of Appeals, First District. Action was brought in the Circuit Court of Monroe County by Rosetta Fearnot, the surviving spouse and administratrix of the estate of her late husband, Garlen Fearnot, against the corporation which owned and operated the Palace Bar, the shareholders of the corporation and others to recover for the wrongful death of her husband. The trial court entered judgment on a verdict awarding $93,000 to the plaintiff. The Court of Appeals reversed the judgment insofar as it was adverse to one of the individual shareholders and further found the award of damages to be excessive. The judgment of the trial court was in all other respects affirmed. *Palace Bar, Inc.* v. *Fearnot,* (1978) Ind. App., 376 N.E.2d 1159.

On January 3, 1974, Garlen Fearnot entered the Palace Bar for the purpose of purchasing and being served alcoholic beverages. According to testimony, Fearnot had consumed two shots of whiskey but did not appear intoxicated when, without saying anything, he abruptly left the bar and started toward the rear of the premises. Witnesses stated that Fearnot staggered as he walked, bumped against a booth and stumbled against a pinball machine as he left the front room of the bar and continued toward the rear door, which was the door he customarily used. Subsequently, the staggering Garlen Fearnot, according to conflicting testimony, either fell down the stairs or, while clutching for the hand rail, slid to the landing below.

Walters, the bartender and owner-manager of the Palace Bar, watched Fearnot as he left the bar and, thinking something might be amiss because of Fearnot's past history of heart problems, followed him. According to Walter's testimony, he discovered Fearnot on the stair landing and attempted to be of assistance to Fearnot, who was slumped against the rail, by laying him down on the landing. Walters testified that he asked Fearnot if he could help to which Fearnot replied that he would be all right and to just leave him alone. Walters went back to the front of the bar where he discussed the situation with other patrons. Walters and others apparently checked repeatedly on Fearnot's condition although no one called for medical assistance at that time. Thereafter, about an hour later, Walters apparently discovered that Fearnot had lost consciousness whereupon Walters called for the fire department's emergency medical unit, which was located across the alley from the bar. The responding unit was unable to revive Fearnot who was later pronounced dead at the scene by the Greene County Coroner.

The Coronor ruled that upon observing the body it was his opinion that Fearnot died as a result of a natural cause which appeared to him to be a cerebral hemorrhage. He further stated that it was his opinion that the injuries from the fall could not and did not cause Fearnot's death.

Dr. James Benz, an Indianapolis pathologist who performed the autopsy, attributed Fearnot's death to heart disease. He also stated that although there were bruises found on the body, these bruises were superficial and that Fearnot did not die as a result of a fall or injury. Dr. Benz testified that it was possible that Fearnot was having a heart attack when he left the bar stool and started walking to the back of the room. This, he said, would explain Fearnot's staggering manner, however, he cautioned that there was no way of knowing whether this was true or not. He further testified that it is possible for a fall to bring about a heart attack, but again said that there is no way of knowing whether or

not this actually happened. Dr. Benz also testified that it was possible that Fearnot's life would have been saved with more prompt treatment, however, he warned, this was very speculative.

Evidence further showed that Fearnot experienced a variety of health problems and was, at the time of his death, on total non-service connected disability from the Veteran's Administration. According to testimony, he was known to have had other experiences which required him to lie down for several minutes before being able to continue and he had also confided to others that he had a "bad ticker" or heart problems.

Mrs. Fearnot's complaint consisted of four counts including negligence, nuisance, breach of warranty, and wilful and wanton misconduct. At the close of the plaintiff's evidence, the defendants filed a motion for Judgment on the Evidence under Ind. R. Tr. P. 50 on the ground that the plaintiff had not maintained her burden of proof. We note that the parties have referred to this as a Motion for Directed Verdict throughout this cause which reference is a carryover from our practice under the old procedural rules, wherein the trial judge actually furnished the jury with a verdict of judgment for the defendant and directed that they return such verdict. It is not properly called a directed verdict today since a court no longer directs a verdict, but withdraws the issues from the jury and enters judgment as a matter of law. In this case, the substance of the motion had the same effect, however, and the trial court denied the motion and left the issues before the jury. The defendants refiled their motion at the close of all the evidence and the court again denied the motion. The issues were again raised on the Motion to Correct Errors which was denied by the court and we face those issues here.

Defendants-Appellants' first assignment of error is based on the contention that Mrs. Fearnot did not prove any proximate relationship between the appellants' acts or omissions

and Fearnot's death. We agree with this position and therefore find it unnecessary to consider any of the other issues in this cause. This conclusion also leads us to find the Court of Appeals in error and we therefore vacate their opinion.

It is basic, of course, that the plaintiff had the burden of proving by a preponderance of the evidence that the defendants had a duty to the plaintiff, that the defendant's conduct failed to fulfill or conform to the requisite standard of care required to fulfill that duty and that the plaintiff sustained an injury as a result of that failure. *Miller v. Griesel,* (1974) 261 Ind. 604, 308 N.E.2d 701; *Elliott v. State,* (1976) 168 Ind. App. 210, 342 N.E.2d 674. In order for the plaintiff to carry her burden her evidence must establish that the alleged wrongful act was a proximate cause of the occurrence and that the occurrence was a proximate cause of the injury. *Haney v. Meyer,* (1966) 139 Ind. App. 663, 215 N.E.2d 886; *Mitchell v. Smith,* (1965) 138 Ind. App. 18, 211 N.E.2d 809. Thus, in a jury trial, a court should withdraw the issues from the jury and enter judgment on the evidence in favor of the defendants when, at the close of the plaintiff's evidence, there is a total absence of evidence or reasonable inferences on at least one essential element of the plaintiff's case. Such a judgment is proper when the evidence is without conflict and is susceptible to but one inference and that inference is in favor of the defendants. *Allied Fidelity Ins. Co. v. Lamb,* (1977) Ind. App., 361 N.E.2d 174; *Mamula v. Ford Motor Co.,* (1971) 150 Ind. App. 174. Furthermore, plaintiff's burden requires that she present evidence of probative value based on facts, or inferences to be drawn from facts. Her burden may not be carried with evidence based merely upon supposition or speculation. An inference cannot arise or stand by itself. There must first be a fact established from which an inference arises. *Prudential Insurance Co. v. VanWey,* (1945) 223 Ind. 198, 204, 59 N.E.2d 721, 725. With these well-established rules in mind, we will examine the evidence presented by the plaintiff.

Coroner Maurice Haag, who was described as a medical technician, examined the body at the scene and came to the conclusion that the decedent died of natural causes and not from trauma. He stated that his examination consisted of looking at and feeling the body, and he believed that the cause of death was cerebral hemorrhage. He said that the trauma he observed on and about the body of the decedent could not have caused his death. His testimony in this regard is set out as follows:

### Direct Examination

"Q. Okay. Did you do any physical other than looking. . . .
A. No, sir.
Q. . . . . did you do any physical examination of the body whatsoever?
A. Uh, well. . . .
Q. Other than looking with your hand, I mean such as. . . .
A. Feeling and looking, you know. No. That was it.
Q. You didn't take any tests?
A. No.
Q. Okay. And you made your verdict based upon. . . .
A. Observation.
Q. Observation.
A. Right.

### Cross Examination

Q. In it as I understood your testimony you indicated at the end that death was due to natural causes. Is that correct?
A. That's correct, sir.
Q. Was that your opinion, sir?
A. Yes, sir.

\* \* \*

Q. You simply thought it was death by natural causes, there was no reason to have any further testing or work done?
A. That's right.
Q. You ruled out completely any question about this being an accidental death, didn't you Mr. Haag?
A. Yes, sir.

Q. In other words, you did not feel that the fall or any alleged fall down the stairs caused Mr. Fearnot's death?

A. No, sir.

\* \* \*

Q. She did tell you that he had a history of heart trouble?

A. Right.

Q. Did she ask for you to have an autopsy done at that time?

A. No, sir.

\* \* \*

Q. Do you know Dr. James Benz of Indianapolis, Indiana?

A. Yes, sir.

Q. Tell us what you know about him.

A. Dr. Benz is a forensic pathologist and one of the top men in his field.

Q. If he did an autopsy, would you believe the results of it as a Coroner?

A. I certainly would.

Dr. James Benz, a physician specializing in pathology, performed an autopsy on the body of the deceased. His testimony was that there was no evidence of a cerebral hemorrhage. However, there was evidence of heart disease and it was his unqualified opinion that the decedent died of heart disease. Also, his opinion was that the decedent died of natural causes and not from any of the injuries he received in the fall. He said that he examined the evidence of trauma on and about the body of the deceased and that, in his opinion, this did not, and could not, have caused Fearnot's death. His testimony helpful to a resolution of these issues was as follows:

### Direct Examination

Q. Okay. As a result of the autopsy examination were you able to determine whether, in fact, Garlen Fearnot suffered a cerebral hemorrhage?

A. Yes, sir.

Q. And what were you able to determine?

A. He did not have a cerebral hemorrhage. No, sir.

Q. So then Mr. Haag was wrong in his evaluation and judgment?

A. Yes, sir. As far as the cerebral hemorrhage, yes, sir.

\* \* \*

Q. . . . All right. Dr. Benz, what caused the death of Garlen Fearnot?

A. From my examination it would be my opinion that the significant disease process that was present was heart disease and that it would be my opinion that he died from his heart disease.

Q. Okay. Now you examined the body where, sir?

A. At that time it was known as Marion County General Hospital. The name's been changed since then to Wishard Memorial Hospital, but Marion County General Hospital in Indianapolis, Indiana.

Q. Now at the time of the examination and the autopsy were you able to still physically look at this man's body and determine these bruises or did you do it by some other type process?

A. Well both ways. By that I mean I was able to see the discoloration of the bruises in the face and to be certain that these were bruises and, in fact, to take small pieces from there so that I could perform microscopic examination I cut tissue and took a small piece of tissue from these areas.

Q. Okay. And I can now hand you what has been marked as Plaintiff's Exhibit 4. Number one, is this the man that you did the autopsy on, and number two, is this, do these pictures describe were the bruises. . . .

A. Yes, sir.

\* \* \*

Q. But, Doctor, these bruises did not cause the, the serious or the, the penetration did not bring about Garlen Fearnot's death, in other words, by traumatic conditions? In other words, he did not fall and crush his skull or anything like this, did he?

A. No, sir.

Q. There was, these bruises are not enough to have brought about his death?

A. That's correct.

\* \* \*

Q. Were you able to determine from discussion with anyone what brought about these bruises?

A. I was provided with the information that this man had fallen. A fall could produce these bruises.

Q. Okay. Could, if a fall, if a fall could have produced these bruises could a fall bring about a heart attack?

A. That's possible. Yes, sir.

Q. Okay. Are you able to medically determine one way or the other whether a fall could bring about a heart attack or not?

A. No, sir.

### Cross Examination

Q. And you found no injury to the brain and no fracture to the skull with Mr. Fearnot, did you?

A. I found no fracture of the skull and the only injury to the brain that I did find was the small area, the sub-arachnoid hemorrhage.

Q. That would not have produced his death, would it Doctor?

A. No, sir. I'm certain probably sometime during our life, lifetimes all of us have small sub-arachnoid hemorrhages from falling.

\* \* \*

Q. Well, would the fact that he was wobbling on his feet or unsteady on his feet before he got back to any area where he is alleged to have fallen indicate to you that he was having some kind of internal medical problem going on in his body? Either from alcoholism or from heart attack or from cerebral problems or from something?

A. First of all, what was his normal walk? I mean this was not his normal gait?

Q. That's, the testimony is that he was unsteady on his feet and that was unusual, that, it was noted that he was not walking like he normally did.

A. Then one would presume something was occurring to cause him to collide with these various structures that you indicated.

Q. Could undergoing a heart attack precipitate this kind of behavior, walking unsteadily and bumping into things?

A. Yes, sir. It's possible.

Q. And if he was having a heart attack at this point that, the fall would not have caused that because it had happened by that time, hadn't it? That he's walking toward the back there?

A. That's right. Yes, sir.

\* \* \*

Q. Doctor, is there any way to know whether or not the prompt treatment of a heart attack patient will save his life?

A. No, sir.

Q. No way to tell, is there?

A. No, sir.

Q. Some die when they're treated quickly, some live, there's no way to know, is there?

A. That's correct. Yes, sir.

### Re-Direct Examination

Q. But a, if you say the victim said to leave him alone, that he'd be all right in a few minutes, under these conditions still if they did call the emergency, brought the emergency. If he did live for say an hour afterwards. By getting prompt medical treatment from an emergency squad, say not a doctor, but emergency squad that could have possibly saved the man's life, could it not, in that fact situation?

A. That's possible. Yes, sir.

### Re-Cross Examination

Q. Doctor, you're not telling us are you that had Mr. Fearnot been taken to an emergency medical facility his life would have been saved, are you?

A. No, sir.

Q. That's all.

### Re-Direct Examination

Q. Would the chances of him surviving have been greater if, in fact, he was having a heart attack and if, in fact, at the time that he started experiencing a shortness of breath if immediate emergency attention which was, in this case right across, right in the alley behind this place, they could have come there within say less than 2 minutes and administered resuscitation. Would his chances of living if, in fact, he did have a heart attack, would his chances of living been much greater?

A. That's speculative. It may have been, it may not. I don't know. Again, I've seen individuals in a coronary care unit with. . . ."

The testimony of these two witnesses, as set out above,

represents the total evidence in the case bearing on the cause of death of Garlen Fearnot. It is immediately apparent that even assuming, arguendo, that plaintiff had shown that defendants were negligent, under any of the theories in the complaint, in causing the decedent to fall on to the stair landing, such negligence could not be the proximate cause of death since Fearnot died from natural causes according to the only evidence on the subject and not as a result of any act of these defendants. The single thread of potential evidence that was introduced in an attempt to fill this void, and thereby present a triable issue, was the question of whether or not the fall may have initiated the heart attack that led to his death. The only evidence on this point came from Dr. Benz who stated that it was possible that such a thing could happen but that there was no way of knowing for sure. Dr. Benz's testimony clearly indicates that it was possible that the decedent had a heart attack when he left the bar stool, and it was possible that he had a heart attack when he fell, but there was no way of knowing which of these possibilities actually happened to the point of being a medical fact or conclusion.

The probative value of the testimony of an expert witness is such witness' opinion as an expert based on facts and circumstances given to him or shown to him subsequent to the occurrence of the event. A doctor's testimony can only be considered evidence when he states that the conclusion he gives is based on reasonable medical certainty that a fact is true or untrue. A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a "possible" cause of death. In sum, the total evidence is that the decedent died from natural causes and not because of any acts of defendants regardless of whether or not they may have been negligent.

Since there is no probative evidence that the fall occasioned the heart attack, the jury could not properly draw any inference that such was the case. As we already have stated, and inference must be drawn from a fact. Under these circumstances, to allow the jury to deliberate on the issue of cause of death was to allow them to speculate as to possibilities and nothing more.

Plaintiff next attempts to maintain her cause of action by invoking the rescue doctrine. She bases this on the fact that defendants allegedly permitted the decedent to lie on the landing without summoning aid which, as it turned out, was nearby in the form of a fire department emergency squad. The evidence shows that an hour passed from the time the decedent fell until it was recognized that he was dead.

At common law, there was no general duty to aid a person who was in peril. *L. S. Ayres & Co.* v. *Hicks*, (1941) 220 Ind. 86, 40 N.E.2d 334; *Hurley, Administrator* v. *Eddingfield*, (1900) 156 Ind. 416, 59 N.E. 1058. However, in *L. S. Ayres & Co.* this court held that in some situations there may be a duty to render aid to an injured person notwithstanding that such persons injuries were not the result of the rescuer's negligence. *See also Tippecanoe Loan & Trust Co.* v. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.*, (1915) 57 Ind. App. 644, 104 N.E. 866; *Depue* v. *Flatau*, (1907) 100 Minn. 299, 111 N.W. 1. In both the *Tippecanoe Loan Co.* and *L. S. Ayres & Co.* cases there was evidence that the plaintiff's injuries were aggravated between the time when they were first put in peril and the time when they received assistance and extrication from their perilous situations. In *L. S. Ayres & Co.*, this court found the appellant liable for aggravation of injuries when it failed to extricate the appellee, a six-year-old boy, whose fingers were caught in the moving parts of an escalator. This holding obtained even though the jury conclusively established that the appellant was not negligent with respect to the choice, construction, or manner of operating the escalator. In so

holding, we stated that it may be deduced from the *Tippecanoe Loan Co.* case that there may be a legal obligation to take affirmative steps to affect the rescue of a person who is helpless and in a situation of peril when the defendant is a master or an invitor and when the injury resulted from the use of an instrumentality under the control of the defendant.

The evidence in *L. S. Ayres & Co.* showed that after the boy's fingers were caught in the moving parts of the escalator, the continued turning of the stairs caused severe injury to his fingers and hands which would not have occurred had the escalator been stopped sooner. The escalator on which the boy was injured was equipped with switch buttons at each floor landing by which it could be stopped in about two and one-half steps. The appellant had clerks working within fifty feet of where the boy was injured, and none of these clerks had been instructed on how to stop the escalator which was moving at the rate of ninety feet per minute. The boy's fingers were caught in the mechanism almost as soon as he fell, but the escalator ran approximately seventy steps or more before it was stopped. Approximately three to five minutes passed from the time when the boy was first injured until his fingers were released. It was further established that the boy's injuries were increased by the grinding effect on his fingers which continued until the escalator was stopped. In finding that the trial court properly overruled a motion for directed verdict at the close of the plaintiff's case, this court said:

> "There may be principles of social conduct so universally recognized as to be demanded that they be observed as a legal duty, and the relationship of the parties may impose obligations that would not otherwise exist. Thus, it has been said, that, under some circumstances, moral and humanitarian considerations may require one to render assistance to another who has been injured even though the injury was not due to negligence on his part and may have been caused by the negligence of the injured person. Failure to render assistance in such a situation may constitute actionable negligence if the injury is aggravated

through lack of due care." *L. S. Ayres & Co., supra,* at 220 Ind. 93-94, 40 N.E.2d 337.

In order for the plaintiff in this case to maintain her cause of action in the fact of a Motion for Judgment on the Evidence at the close of her case-in-chief, it was necessary that she present evidence of probative value that there was an aggravation of injuries, following decedent's fall on the stairs, which could have been prevented by immediately aid. Again, the sole evidence on this issue comes from the testimony of Dr. Benz. Dr. Benz testified that he did not know whether or not immediate aid would have prevented the heart seizure from causing Fearnot's death. Dr. Benz was asked, "Would his chances of living been much greater if aid had come to him very soon?" and the doctor answered, "That's speculative. It may have been, it may not, I don't know." This response did not constitute evidence which would justify the jury in inferring that defendant's alleged failure to render aid to the decedent was the proximate cause of his death. Such an inference would have been proper only if Dr. Benz had stated that in his opinion, based on a reasonable medical certainty, immediate aid would or could have saved Fearnot's life.

Accordingly, we hold that the trial court should have withdrawn the issues from the jury and entered judgment for the defendants. Transfer is granted, and the judgment of the trial court is reversed and this cause is remanded with instructions to enter judgment for defendants on all issues.

All Justices concur.

NOTE.—Reported at 381 N.E.2d 858.