IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 23, 2008 Session

## BEVERLY LOCKARD v. CHRISTOPHER H. BRATTON, M.D., ET AL.

### Direct Appeal from the Circuit Court for Henderson County
No. 06061     Roger A. Page, Judge

_____

### No. W2007-02820-COA-R3-CV - Filed February 4, 2009

_____

In this appeal, we are asked to determine whether the trial court erred in excluding Appellant's expert's standard of care and causation opinions and in granting summary judgment to the Appellees as to Appellant's medical malpractice and lack of informed consent claims. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Les Jones, Frank B. Thacher, III, Memphis, TN, for Appellant

Marty R. Phillips, Craig P. Sanders, Jackson, TN, for Appellee, Christopher H. Bratton, M.D.

Jeffrey L. Lay, Dyersburg, TN, for Appellee, John A. Green, M.D.

Sadia S. Staton, Kate R. Armes, Jackson, TN, for Appellee, Lexington Hospital Corporation, assumed name Henderson County Community Hospital

# OPINION [1]

## I. FACTS & PROCEDURAL HISTORY

On May 16, 2005, at approximately 9:00 A.M., Beverly Lockard ("Appellant") presented to the Henderson County Community Hospital (the "Hospital") emergency room in Lexington, Tennessee, via an ambulance, after passing out at her home. Appellant reported being six to eight weeks pregnant, and complained of abdominal pain and mild vaginal bleeding. The twenty-eight year old Appellant had experienced at least three spontaneous miscarriages prior to this episode and had never been able to achieve the live birth of a child. In the emergency room, Appellant was evaluated and underwent an OB ultrasound, which was read by Dr. John Green ("Dr. Green"), a radiologist. According to Dr. Green's Radiology Report, the ultrasound revealed "no evidence of intrauterine pregnancy or ectopic pregnancy[;]" thus his impression was that an "apparent complete spontaneous abortion" had occurred.

That afternoon, Appellant was admitted to the Hospital by Dr. Fletcher. After evaluating Appellant and determining that she needed to be seen by a surgeon, Dr. Fletcher consulted with Dr. Christopher Bratton ("Dr. Bratton"), a general surgeon, who took over Appellant's care on the evening of May 16, 2005. According to Dr. Bratton's Discharge Summary, after evaluating Appellant and reviewing her medical chart, he initially suspected four potential causes for her symptoms: (1) "[p]ossible hepatic adenoma or bleeding from such[; (2)] [r]ight renal problem either pyelonephritis or ureterolithiasis[; (3)] [a]ppendicitis [; or (4)] [e]ctopic pregnancy." Dr. Bratton recommended a laparoscopic examination that evening, but Appellant declined because she believed that she was still pregnant and did not want to jeopardize the pregnancy.

On the morning of May 17, 2005, a repeat pelvic ultrasound was performed. Dr. Green's Radiology Report stated:

> There is definitely a left adnexal ectopic pregnancy. There is noted to be a thick-walled gestational sac in the lower left adnexa with a single fetus which has a good fetal heart beat. The fetal heart rate is 154 beats per minute. This is either in the left ovary or in the end of the fallopian tube adjacent to the left ovary. The appearance is that of a left ovarian ectopic pregnancy.

His final impression was a "left adenexal ectopic pregnancy, most likely left ovarian, with associated pelvic hemorrhage."

---

[1] Lexington Hospital Corporation, assumed name, Henderson County Community Hospital, was previously a defendant in this case. However, Appellant dismissed her claims against the Hospital at oral argument on October 23, 2008.

Dr. Bratton then recommended surgery for the ectopic pregnancy; however, the surgery was delayed until approximately 7:00 P.M. because Appellant ate a sausage biscuit against orders not to eat or drink. According to his Operative Report, during the surgery Dr. Bratton checked Appellant's right and left fallopian tubes. He could not "identify an exact source of the ectopic pregnancy[; however] [i]t appeared to be in the left fallopian tube which coincided with the pre-operative ultrasound." The left fallopian tube was removed and opened, but no gestational sac could be identified. According to a later Pathology Report, the left fallopian tube was found to have "features compatible with salpingitis isthmica nodosa[,]" which, Dr. Strickland testified can "make the [fallopian] tube bulge and appear like a tube that has an ectopic pregnancy." Upon finding the left fallopian tube did not contain the ectopic pregnancy, Dr. Bratton rechecked the right tube, and after removing adhesions, was able to identify the ectopic pregnancy in the right fallopian tube. The ectopic pregnancy was removed and the right tube preserved for possible future fertility.

On May 8, 2006, Appellant filed a Complaint for Damages against Dr. Bratton alleging that "[a]s a direct and proximate result of the negligence of Dr. Bratton, Ms. Lockard has a severely diminished chance of future pregnancy. . . . [, and] sustained the following injuries and damages: (a) past and future pain and suffering; (b) severe emotional damage; (c) future medical expenses; and (d) loss of enjoyment of life." On May 17, 2006, Appellant filed her First Amended Complaint for Damages to join as defendants, Dr. Green and the Henderson County Community Hospital. Appellant then filed a Second Amended Complaint for Damages on September 17, 2007, further alleging that Dr. Bratton failed to obtain her informed consent, thus rendering the May 17, 2005 surgery a battery.

Following commencement of the lawsuit, the parties conducted extensive discovery. On March 26, 2007, the trial court entered an Agreed Scheduling Order setting the case for a jury trial on November 5, 2007. The Agreed Scheduling Order ordered Appellant to "reveal the names of her expert witnesses to opposing counsel no later than May 7, 2007[.]" Prior to May 7, 2007, Appellant disclosed three expert witnesses: Dr. Strickland, on the issues of standard of care as to Dr. Bratton and causation; Dr. Washburn, a radiologist, on the issue of standard of care as to Dr. Green; and Dr. Carl F. Patty, M.D. ("Dr. Patty"), one of Appellant's treating physicians, on the issue of damages only.

On October 10, 2007, Dr. Bratton filed a Motion to Exclude Causation Opinions of Daniel M. Strickland, M.D. ("Motion to Exclude Causation Opinions"), arguing that "Dr. Strickland's causation opinions fail to meet the burden mandated by Tennessee Code Annotated § 29-26-115. . . . [as] Dr. Strickland admitted that he could not opine that Dr. Bratton's acts or omissions 'more probably than not' caused Plaintiff to become unable to conceive and give birth." In reliance on Dr. Bratton's Motion to Exclude Causation Opinions, both Dr. Green and the Hospital filed motions in limine to exclude Dr. Strickland's opinion as to causation. Dr. Bratton also filed a Motion to Exclude Standard of Care Opinions of Daniel M. Strickland, M.D., arguing that such opinions "fail to meet the requirements of Tennessee Code Annotated § 29-26-115. . . . [as] Dr. Strickland failed to offer any testimony regarding the 'recognized standard of acceptable professional practice' required of Dr. Bratton[.]" Further, Dr. Bratton's Motion contended that "Dr. Strickland failed to

demonstrate sufficient knowledge of the standard applicable to . . . a general surgeon practicing in Lexington, Tennessee[,] or a similar community.

Subsequently, Dr. Green and the Hospital filed Motions for Summary Judgment as to all claims against them. Dr. Bratton filed Motions for Summary Judgment, seeking dismissal of Appellant's lack of consent and medical battery claims, as well as Appellant's medical malpractice claim.

The trial court conducted a pre-trial conference on October 23, 2007, wherein the court heard arguments on the aforementioned motions for summary judgment and motions to exclude Dr. Strickland's causation testimony. In a November 21, 2007 Order Granting Defendants' Motions for Summary Judgment and Motions to Exclude Causation Testimony of Daniel M. Strickland, M.D., the trial court found that Appellant "failed to present competent expert proof on the issue of causation[,]" as required by Tennessee Code Anotated § 29-26-115(a)(3). Instead, the court found Dr. Strickland's testimony that "Plaintiff would have a better 'chance' or 'possibility' of getting pregnant but for the alleged malpractice[,]" "regard[ed] a loss of chance theory of recovery[,]" which is not recognized as a theory of recovery in a medical malpractice action in Tennessee. Thus, the trial court excluded Dr. Strickland's causation testimony and granted summary judgment on the issue. Likewise, the trial court granted summary judgment as to Appellant's claims "for the fear and distress resulting from her alleged apprehension of a diminished ability to get pregnant. . . . [as] Plaintiff [] presented no expert testimony that her fear and distress were caused by any act or omission by Defendants[.]" Finally, also on November 21, 2007, the trial court entered an Order Granting Defendant Christopher H. Bratton, M.D.'s Motion for Summary Judgment as to Plaintiff's Claims for Medical Battery and Lack of Informed Consent, finding that "Plaintiff admittedly signed a Consent for Surgery/Special Procedure form authorizing the surgical procedures performed by Dr. Bratton." It is from these Orders that Appellant now appeals.

## II.  ISSUES PRESENTED

Appellant has timely filed her notice of appeal and presents the following issues for review, summarized as follows:

1.      Whether the trial court erred in excluding Dr. Strickland's standard of care opinions;
2.      Whether the trial court erred in excluding Dr. Strickland's causation opinions;
3.      Whether the trial court erred in granting Defendants' Motions for Summary Judgment as to Plaintiff's medical malpractice claim; and
4.      Whether the trial court erred in granting Defendant Bratton's Motion for Summary Judgment as to Plaintiff's lack of informed consent claim.

For the following reasons, we affirm the decision of the circuit court.

### III.   STANDARD OF REVIEW

In the instant case, we are asked to review the trial court's exclusion of expert testimony.  "In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court."  *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 556, 562 (Tenn. 1993)).  "The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused."  *Id.*

Additionally, we are asked to review the trial court's grant of summary judgment to a defendant.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Tenn. R. Civ. P. 56.04.  Ruling on a motion for summary judgment does not involve disputed issues of fact, but only questions of law.  *Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001).  Thus, our standard for reviewing a grant of summary judgment is *de novo* with no presumption of correctness as to the trial court's findings.  *See Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001).  The evidence must be viewed "in the light most favorable to the nonmoving party," and all reasonable inferences must be drawn in the non-moving party's favor.  *Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000).

### IV.   DISCUSSION

#### A.   Exclusion of Dr. Strickland's Causation Testimony

Tennessee Code Annotated section 29-26-115, our state's medical malpractice statute, sets forth the necessary elements for a medical malpractice claim:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence . . . :
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;[2]
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

---

[2] In this opinion we, at times, refer to this element as the "standard of care."

-5-

(3) *As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.*

. . . .

(d) In a malpractice action as described in subsection (a), the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall further be instructed that injury alone does not raise a presumption of the defendant's negligence.

Tenn. Code Ann. § 29-26-115 (Supp. 2008) (emphasis added). "The critical issue in this appeal, as in all loss of chance cases, is whether the Plaintiff[] ha[s] failed, as a matter of law, to establish the existence of causation, i.e., that the purported medical malpractice actually caused the harm complained of." ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 598 (citing *McKellips v. St. Francis Hosp., Inc.*, 741 P.2d 467, 470-71 (Okla. 1987)). "This question dominates because the rule requiring causation be proven by a preponderance of the evidence dictates that Plaintiff[] demonstrate the negligence *more likely than not* caused the injury." ***Id.*** at 598-99 (citing *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)).

[P]roof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.

***Kilpatrick***, 868 S.W.2d at 602 (citing *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)).

Furthermore, the admissibility of expert testimony in this state has been clearly articulated. Tennessee Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Our Supreme Court has stated that "[a] doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own

speculation as to what is or is not possible[,]" ***Lindsey***, 689 S.W.2d at 862 (quoting *Palace Bar, Inc. v. Fearnot*, 381 N.E.2d 858, 864 (1978); thus, "[t]he mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." ***Id.*** (citing *Kirschner v. Broadhead*, 671 F.2d 1034, 1039 (7th Cir. 1982)).

On appeal, Appellant asserts that the circuit court erred in excluding Dr. Strickland's causation opinions. In her Brief, Appellant states that she seeks recovery for a "severely diminished chance of future pregnancy." She claims to be "unaware of any Tennessee appellate opinion addressing the issue of recovery for a diminished chance of pregnancy[,]" but cites cases from other jurisdictions, which she claims allow such recovery. Although Appellant acknowledges that Tennessee does not recognize a "loss of chance" theory of recovery in medical malpractice actions, she contends that she is entitled to recovery under *Kilpatrick*, 868 S.W.2d at 603, because she can show: "(1) she had a better than fifty percent chance of a favorable outcome prior to the negligence act or omission, and (2) she has a less than fifty percent chance of a favorable outcome after the negligent act or omission."

To satisfy the first prong for recovery under *Kilpatrick*–that she had a better than fifty percent chance of becoming pregnant before the removal of her left fallopian tube–Appellant states: "[Appellant] undeniably had the ability to conceive naturally prior to having her left fallopian tube negligently removed: Ms. Lockard had become pregnant at least three times prior to Dr. Bratton's surgery." "This fact alone[,]" she claims, "should remove all doubt as to what her chances of natural pregnancy were before May 17, 2005[,]"the date of the surgery at issue. However, Appellant also relies on the testimony of Dr. Strickland to show her ability to become pregnant before the surgery. Specifically, she relies on the following deposition testimony:

> Q. Okay. Does the fact that Ms. Lockard had three or four miscarriages mean that she would never have been able to have a baby through normal means if her left fallopian tube had remained intact?
>
> A. It doesn't mean that at all. And actually, to the contrary, it would have been prognostically very good for her eventually to have a successful pregnancy had that normal tube been left in place.
>
> Q. Can you explain what you mean by that?
>
> A. Well, the last three pregnancies that she had were with – with her – with the same husband, the same partner. And once she – once she was with Mr. Crow, I believe his name is, she got pregnant relatively easy. I believe, if my numbers are correct, they met in 2002. And she was pregnant in 2003, had a miscarriage. Then she was pregnant early in 2005, had a miscarriage. And then a couple months later got pregnant with this ectopic pregnancy.

-7-

So clearly, she was not infertile. She would – she qualifies as what we call a habitual aborter or chronic miscarriage. But she was – she was not infertile. And actually if a woman can get pregnant, even if for some reason she can't carry that pregnancy every time, prognostically, that gives the – the gynecologist or the reproductive edocrinologist a lot of hope that can finally successfully get her to carry a pregnancy. We have to do some tests. We have to do some treatments, but it's prognostically very good.

Additionally, Appellant points to Dr. Strickland's testimony, where he stated that "the literature supports the probability that [Appellant] could conceive from that left fallopian tube[.]" "This testimony[,]" Appellant claims, "is clear that Ms. Lockard had a significant chance – certainly better than a fifty percent chance, as required by the legal standard – of becoming pregnant naturally prior to the negligent removal of her left fallopian tube."

Appellant also relies on Dr. Strickland's testimony to support her contention that although she had a better than fifty percent chance of becoming pregnant prior to the surgery, she now has a less than fifty percent chance of becoming pregnant naturally. Specifically, Appellant points to Dr. Strickland's testimony, which reads, in part:

Q. Dr. Strickland, have you formed any opinion as to whether or not Ms. Lockard could become pregnant through normal means now that her left fallopian tube has been removed?

A. Yes.

Q. And what is your opinion?

A. My opinion is that it is extremely unlikely that she can get pregnant naturally.

Q. When you say extremely unlikely, can you put a percentage on that?

A. Vanishingly small. We – we – in medicine, we usually don't say zero or never, but her chance of having a pregnancy is extremely small. And our course, if she had a pregnancy, it would more likely than not be an ectopic pregnancy. But, you know, a number, certainly less than 10 percent but probably more – probably less, small than that. But for all practical purposes, she has almost a zero probability of getting pregnant naturally.

We find Dr. Strickland's testimony that the chances of Appellant becoming pregnant were "prognostically very good," that her prior pregnancies gave the doctors "a lot of hope," and that the literature "supports the probability" that she could have conceived from her left fallopian tube had it not been removed, offers only "the mere possibility of a causal relationship," *see Lindsey*, 689 S.W.2d at 862 (citing *Kirschner*, 671 F.2d at 1039), and therefore was correctly excluded.

Moreover, additional testimony offered by Dr. Strickland, which Appellant failed to cite, further demonstrates his inability to testify that Appellant had a fifty percent chance of becoming pregnant prior to the surgery. Upon cross-examination at deposition, Dr. Strickland also provided the following testimony:

> Q. With regard to assessing Ms. Lockard's chances of becoming pregnant if Dr. Bratton had done everything that you say he should have done, you would agree with me that you can't put a number on that, right?
>
> A. I would agree.
>
> Q. And it's your opinion that nobody can do that, right?
>
> A. I would agree.
>
> Q. No human can put a number on that, right?
>
> A. I said that in my other deposition, yes.
>
> Q. Yes, sir. And you also said that you couldn't quantify [it] in any way, correct?
>
> A. That's right.
>
> Q. And you couldn't say whether more probably than not Ms. Lockard could have gotten pregnant and carried a baby to term if Dr. Bratton had done everything that you say; am I right about that?
>
> A. You're right. I can't use that term – I can't use that phraseology.
>
> Q. And you can't say whether – if Dr. Bratton had done everything you say he should have done, she had a better than 50 percent chance or less than 50 percent chance of getting pregnant and carrying the baby to term, right?

. . . .

A.   Yeah.  That's a – that's a form of crude quantification. And I said I can't quantify it.  What I can say is though, the literature supports the probability that she could conceive from that left fallopian tube, but I can't put a number on it, and the literature can't put a number on it either.

Q.   And whatever her condition was before, you can't quantify that in terms of expressing anything to a reasonable degree of medical certainty because that would really be putting a number on it or quantifying it; am I right?

A.   That would be quantifying it.  But as I said before in answer to a question [Appellant's counsel] asked me, that had she – if she still had that left fallopian tube, she would still have a reasonable chance of getting pregnant naturally.  But indeed, I can't put a number on that reasonableness.

Because Dr. Strickland could not state that Appellant had a greater than fifty percent chance of becoming pregnant prior to the alleged negligence of the Defendants, as to provide testimony that would "substantially assist the trier of fact," the trial court did not abuse its discretion in excluding such testimony.

### B.   *Grant of Summary Judgment as to Medical Malpractice Claim*

We perceive Appellant to offer three arguments as to why summary judgment as to her medical malpractice claim was improper: (1) she is entitled to recovery for the loss of her left fallopian tube, regardless of its ability to function before the surgery; (2) she is entitled to recover for her mental and emotional distress, regardless of the surgery's impact on her ability to become pregnant; and (3)  Dr. Patty offered sufficient causation testimony.  We address each argument below.

### 1.   Loss of Body Part

Appellant maintains that even if she failed to present "competent proof of her diminished ability to become pregnant, this fact is not dispositive of her entire medical malpractice claim against Defendants[;]" thus, she alleges, the trial court erred in granting summary judgment as to her medical malpractice claim.  Essentially, Appellant argues that she is entitled to recovery for the loss of a body part–her left fallopian tube–regardless of its ability to function.  In support of this argument, Appellant states that her "lost flesh and blood" constitutes "bodily injury," citing *Overstreet v.*

*Shoney's Inc.*, 4 S.W.3d 694, 703 (Tenn. 1999) (citations omitted),[3] wherein the Tennessee Supreme Court stated that "[t]he purpose of tort damages in Anglo-American law is to compensate the wronged party for damage or injury caused by the defendant's conduct[, and that] [t]he goal of awarding damages is to repair the wronged party's injury, or at least, to make the wronged party whole as nearly as may be done by an award of money."

To recover under the medical malpractice statute, Appellant must prove by expert testimony: (1) "[t]he recognized standard of acceptable professional practice in the profession and the specialty . . . in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;" (2) that the defendant failed to adhere to such standard; and (3) as a result of that failure, the plaintiff suffered injuries that otherwise would not have occurred. **Tenn. Code Ann. § 29-26-115 (Supp. 2008)**. Appellant may not recover for the loss of her left fallopian tube absent such proof. The trial court found that Appellant "failed to adduce competent expert proof from a qualified expert regarding the recognized standard of acceptable professional practice required of a general surgeon practicing in Lexington, Tennessee or similar community in 2005[,]" and thus granted Defendants' motions for summary judgment. We find that the trial court did not abuse its discretion in so ruling, as we find Dr. Strickland testified to the recognized standard of acceptable professional practice required of a *gynecologist*, rather than a general surgeon.

In his deposition, Dr. Strickland testified as follows:

> Q. Are you familiar with the standard of care for a surgeon who is performing an operation for an ectopic pregnancy in either Lexington, Tennessee or a similar community?
>
> . . . .
>
> A. Yes I am. And the reason for that is, he basically is providing gynecology services. The hospital advertises that they provide gynecology services. When that general surgeon agrees to take care of a patient who has a potential ectopic pregnancy, then that surgeon is basically saying, I am competent to take care of this patient.
>
> . . . .
>
> Q. What does the standard of care require for a surgeon such as Dr. Bratton in that situation?

---

[3] Appellant's Brief cites *Kilpatrick v. Bryant*, 868 S.W.2d 594, 703 (Tenn. 1993) as the source for this quotation; however, it is actually attributable to *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 703 (Tenn. 1999).

A.   A surgeon such as Dr. Bratton, who was basically acting as a gynecologist, because the hospital holds itself out as providing gynecology services, and Dr. Bratton accepted this patient who had a gynecologic condition and was accepting that he could provide the necessary gynecologic surgical procedure.

. . . .

That was his obligation as somebody functioning as a gynecologic surgeon.

. . . .

Q.   And you agree with me that there was no gynecologist in Lexington in 2005, correct?

A.   There was not a – a gynecologist in the sense that you mean somebody who's doing an OB-GYN residency.  But there was someone who held themselves out as being competent to provide gynecologic surgery.  So –

. . . .

A.   To the extent of this case, there was a – for all practical purposes, a gynecologist.  That was Dr. Bratton.  If Dr. Bratton did not consider himself a gynecologist for purposes of this case, then again, as I said, he would have immediately transferred her out to someone who could take care of the patient.
      If he felt that a gynecologist had to be there to take care of this patient, that's another reason he should have transferred her on the 16th of May.  The fact that he did not do that indicates that he was holding himself out to everybody, including Ms. Lockard, that he was a gynecologic surgeon who could take care of this problem.  So in that sense, he was a gynecologist.

In addition to the Tennessee Code's requirement that experts demonstrate knowledge of the acceptable standard of care, Tennessee Code Annotated section 29-26-115(b) requires a medical malpractice expert be "licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case[.]" However, this requirement "does not require that the expert practice the same profession or specialty as the defendant, 'so long as the expert had a sufficient basis on which to establish familiarity with the defendant's field of practice and the standard of care required in dealing with the medical care

at issue.'" ***Land v. Barnes***, No. M2008-00191-COA-R3-CV, 2008 WL 4254155, at*4 (Tenn. Ct. App. Sept. 10, 2008) (quoting *Bravo v. Sumner Regional Health Sys., Inc.*, 148 S.W.3d 357, 367 (Tenn. Ct. App. 2003)). Thus, that Dr. Strickland is a gynecologist, rather than a general surgeon, does not automatically disqualify him from testifying as an expert against Dr. Bratton. However, because Dr. Strickland did not base his familiarity with the required standard of care on his knowledge of general surgery, but rather by likening Dr. Bratton's actions to that of a gynecologist, we find the trial court did not abuse its discretion in excluding Dr. Strickland's testimony. Consequently, without expert proof as to the "acceptable professional practice in the profession and the specialty . . . in which the defendant practices or in a similar community[,]" Appellant's claim for the loss of her fallopian tube fails.

## 2. Pain and Suffering

In her Complaint for Damages, Appellant alleged that "[a]s a direct and proximate result of the negligence of Dr. Bratton, Ms. Lockard sustained the following injuries and damages: (a) past and future pain and suffering; (b) severe emotional damage; (c) future medical expenses; and (d) loss of enjoyment of life." In her Brief, Appellant argues that "[a]ssuming . . . that Plaintiff has not presented competent proof as to her diminished ability to become pregnant, this fact is not dispositive of her entire medical malpractice claim against Defendants." Instead, she contends, she "is entitled to recover for the mental and emotional distress that resulted from Dr. [Bratton] removing the wrong fallopian tube - a physical injury - regardless of whether she can prove that the removal had a negative impact on her ability to get pregnant in the future." Thus, we perceive Appellant to maintain that she is entitled, under the medical malpractice statute, to recover for her mental and emotional distress associated with the loss of her fallopian tube, regardless of the effect that such removal had on her ability to become pregnant naturally.[4] In support of this contention, Appellant cites *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431, 434 (Tenn. 1982), wherein our Supreme Court allowed the plaintiffs to recover for mental anguish where the defendant's negligence caused the plaintiffs to ingest polluted water, despite the water testing negative for the presence of carcinogens. Additionally, she cites *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 715-17 (Tenn. Ct. App. 1999), wherein the plaintiff was allowed to recover for pain and suffering after sustaining an eye injury. To justify the award in *Overstreet*, this Court noted that the plaintiff underwent numerous invasive surgeries, was required to wear an unattractive eye shield, lost the vision in her left eye which ended her career, and is forced to live in constant fear of losing the vision in her right eye, rendering her totally blind. *Id.* at 716. Furthermore, Appellant cites *Pizzalotto v. Wilson*, 444 So.2d 143 (La. Ct. App. 1983), in which the Louisiana Court of Appeals allowed an award of damages for the shock the plaintiff suffered in learning that her reproductive organs had been removed without her consent, despite the fact that the plaintiff was sterile prior to the surgery. Finally, Appellant cited *McKersie v. Barnes Hospital*, 912 S.W.2d 562, 566 (Mo. Ct. App. 1995), in which the Missouri Court of Appeals allowed recovery for the emotional distress suffered from

---

[4] Appellant does not characterize her claim for mental and emotional distress as one of negligent infliction of emotional distress. Therefore, we will not address her claim as such.

the allegedly negligent removal of the plaintiff's ovary and fallopian tube, even though plaintiff failed to show that such losses left her unable to conceive a child.

We find Appellant's claim without merit. In so finding, we distinguish the Tennessee cases cited by Appellant, as neither involves a medical malpractice claim. Likewise, we are not persuaded by the cases cited from other jurisdictions as both Louisiana and Missouri allow recovery for a loss of chance. *See Hastings v. Baton Rouge Gen.* Hosp., 498 So.2d 713, 720 (La. 1986); Wollen *v. DePaul Health Ctr.*, 828 S.W.2d 681, 685 (Mo. 1992) (en banc). To recover under our state's medical malpractice statute, a plaintiff must prove: (1) the standard of care; (2) "[t]hat the defendant acted with less than or failed to act" within the standard of care; and (3) the defendant's negligent act or omission proximately caused the plaintiff to suffer injuries that he or she would not otherwise have suffered. **Tenn. Code Ann. § 29-26-115(a) (Supp. 2008)**. We find that Appellant is not entitled to recover for her alleged mental and emotional distress, as she has failed to satisfy the requirements of the medical malpractice statute. As we noted above, Appellant failed to prove "the recognized standard of acceptable professional practice in the profession and the specialty thereof . . . in the community in which the defendant practices or in a similar community[;]" thus, her claim for mental and emotional distress, pursuant to Tennessee Code Annotated section 29-26-115, was properly dismissed.

### 3. Testimony of Dr. Patty

Finally, to support her contention that summary judgment was improperly granted, Appellant relies on the Affidavit of her treating physician, Dr. Patty, filed October 27, 2007. In his Affidavit, Dr. Patty stated that "[w]hile I am not able to quantify her chances of getting pregnant or 'put a number on it[,]' it is my professional opinion that it is more likely than not that Ms. Lockard would have been able to get pregnant had her left fallopian tube not been removed."

Defendants contend that the trial court excluded Dr. Patty's Affidavit as it was submitted after the deadline set forth in the Agreed Scheduling Order for disclosing expert witnesses, as Dr. Patty was disclosed only on the issue of damages. However, while the trial court noted that the Affidavit was filed after the deadline, it did not expressly exclude such based on Appellant's untimely filing.[5] Additionally, Appellant claims that she was not required to disclose Dr. Patty, as he was Appellant's treating physician. Nonetheless, even considering Dr. Patty's Affidavit, we find

---

[5] With respect to Dr. Patty, the trial court's Order Granting Defendants' Motions for Summary Judgment and Motions to Exclude Causation Testimony of Daniel M. Strickland, M.D. stated:

> Plaintiff also filed the affidavit of Dr. Carl Patty after the deadline set forth in the Court's Scheduling Order. Dr. Patty's testimony fails to carry Plaintiff's burden on the issue of causation. He does not state that Plaintiff suffered any injury that would not otherwise have occurred but for the alleged malpractice. Moreover, he never provides any reliable bases for the opinion that he does provide, which relates only to Plaintiff's chance of becoming pregnant.

it does not create a genuine issue of material fact such that summary judgment as to Appellant's medical malpractice claim was inappropriate.

Prior to the filing of Dr. Patty's Affidavit, Dr. Patty was deposed on September 5, 2007, and provided the following testimony:

> Q. Based on your examination and reviewing the medical records, Doctor, was Ms. Lockard able to get pregnant before the surgery that removed her fallopian tube?
> A. Yes.
> Q. And, Doctor, would you be able to say what Ms. Lockard's chances were of getting pregnant prior to having that fallopian tube removed?
> A. No.
> . . . .
> Q. [] Because of the limited information that you have available, you're not able to fully assess or accurately quantify the effect that Ms. Lockard's ectopic pregnancy and the surgery to remove that ectopic pregnancy may have had on her overall ability to become pregnant and deliver a live baby?
> A. I would agree with that.

"It is a rule of law in this state that contradictory statements of a witness in connection with the same fact have the result of 'cancelling each other out.'" ***Taylor v. Nashville Banner Publ'g Co.***, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978) (citing *DeGrafenreid v. Nash. Ry. & Light Co.*, 39 S.W.2d 274 (Tenn. 1931); *Johnson v. Cincinnati N. O. & T. P. Ry. Co.*, 240 S.W. 429 (Tenn. 1922); *Donaho v. Large*, 158 S.W.2d 447 (Tenn. Ct. App. 1941); *S. Motors, Inc. v. Morton*, 154 S.W.2d 801 (Tenn. Ct. App. 1941); *Nashville & Am. Trust Co. v. Aetna Cas. & Sur. Co.*, 110 S.W.2d 1041 (Tenn. Ct. App. 1937)). "Two sworn inconsistent statements by a party are of no probative value in establishing a disputed issue of material fact." ***Price v. Becker***, 812 S.W.2d 597, 598 (Tenn. Ct. App. 1991) (citing *Tibbals Flooring Co. v. Stanfill*, 410 S.W.2d 892 (Tenn. 1967); *Ayers v. Rutherford Hosp. Inc.*, 689 S.W.2d 155 (Tenn. Ct. App. 1984)). Because Dr. Patty's Affidavit contradicts his earlier deposition testimony concerning Appellant's ability to become pregnant prior to the surgery, Dr. Patty's Affidavit creates no genuine issue of material fact as to causation, such that the trial court's grant of summary judgment as to Plaintiff's medical malpractice claim was inappropriate.

### C. *Grant of Summary Judgment as to Lack of Informed Consent Claim*

Finally, Appellant claims that the trial court's grant of summary judgment as to her lack of informed consent claim was erroneous. Appellant argues that Dr. Bratton failed to adhere to the standard of care by not obtaining Appellant's informed consent for surgery sooner. Essentially, Appellant contends that if Dr. Bratton had obtained Appellant's consent for surgery on the evening

of May 16, 2005, the surgery would have been performed both before Dr. Green's report indicating a left ectopic pregnancy was prepared and before the ectopic pregnancy ruptured sometime between the mornings of May 16 and May 17, 2005, decreasing Dr. Bratton's ability to determine the location of ectopic pregnancy.

The trial court, in granting summary judgment as to Appellant's informed consent claim, found that "Plaintiff has failed to support her lack of informed consent claim with competent reliable expert proof as mandated by Tennessee Code Annotated [section] 29-26-118[,]" which provides:

> In a malpractice action, the plaintiff shall prove by evidence as required by § 29-26-115(b)[6] that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices an in similar communities.

"Accordingly, the plaintiff in an informed consent medical malpractice case has the burden of proving: (1) what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the risk posed by the proposed procedure or treatment; and (2) that the defendant departed from the norm." *Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999) (citing *German v. Nichopoulos*, 577 S.W.2d 197, 204 (Tenn. Ct. App. 1978)).

In support of her contention that Dr. Bratton failed to obtain Appellant's informed consent, Appellant cites the deposition testimony of Dr. Strickland, which provides, in part:

> Q. Dr. Strickland, let's break it down. And maybe it will – it will be a little easier for the jury to follow. Express or explain to the jury what opinions you have with respect to Dr. Bratton's failure to comply with the standard of care on May 16th, 2005.
>
> A. He failed to manage the ectopic pregnancy or – he had two choices: Either manage it himself or transfer her to a facility where it could have been properly managed.
>
> Q. Did Dr. Bratton ask Ms. Lockard, to your knowledge, whether or not he could perform a procedure that day?
>
> A. I believe that he recommended it to her, yes.

---

[6]Tennessee Code Annotated section 29-26-115(b) requires expert testimony in medical malpractice cases.

Q. Okay. At that point and time, had he told her that she had an ectopic pregnancy?

A. I believe he said that – he told her that she might have an ectopic.

Q. Okay. Is there a distinction in your mind between telling a patient that – that we're almost certain you have an ectopic pregnancy versus you might have an ectopic pregnancy?

A. There's a big differen[ce].

Q. And how so?

A. Well, when we're talking to a patient, especially about surgery, how the patient reacts and how the patient accepts our recommendation is based on how we explain things and how we emphasize things. If we either don't explain things very well or if we don't emphasize things the way they should be emphasized, then the patient is going to take the decision very lightly, and she really can't make a decision in her best interest.

It's her right to do it, but she can't make a decision unless the physician properly explains everything about it, all the options, and – and provides whatever emphasis he feels should be provided. If the surgeon is lackadaisical about recommending surgery, the patient is not going to feel serious about having it done.

A gynecologist would not have been lackadaisical about recommending surgery for this lady. They would have said to her, Ms. Lockard, you have an ectopic pregnancy. We have to take it out, or you will die. And I have no doubt, if that had been presented to her the night of 16th of May, she would have had the laparoscopy either at Henderson Community or at another hospital.

We find that Dr. Strickland's testimony fails to meet the requirements set forth for informed consent medical malpractice claims. Dr. Strickland's statement that "[a] gynecologist would not have been lackadaisical about recommending surgery for [Appellant]," does not show that "the defendant did not supply appropriate information to the patient in obtaining informed consent . . . in accordance with the recognized standard of acceptable professional practice *in the profession and in the specialty*," as, again, Dr. Bratton is a general surgeon, not a gynecologist. **Tenn. Code Ann. § 29-26-118 (2000)** (emphasis added). Likewise, Dr. Strickland's testimony insinuates that because Appellant declined surgery, Dr. Bratton must have been "lackadaisical" in recommending such;

-17-

however, we find Dr. Strickland's testimony does not *prove* that Dr. Bratton "departed from the norm." *Ashe*, 9 S.W.3d at 121 (citing *German*, 577 S.W.2d at 204). In his deposition, Dr. Strickland acknowledged that he didn't "really know what was said between Dr. Bratton and Ms. Lockard or exactly how it was said since [he] wasn't there[;]" instead he based his "belief" regarding the conversation on both Dr. Bratton's and Appellant's depositions. In her deposition, Appellant did not speak specifically about the language Dr. Bratton utilized in recommending surgery. Instead, the only language concerning Appellant's conversations with Dr. Bratton is as follows:[7]

Q. Do you remember any conversations with Dr. Bratton before he did the surgery?

A. I remember talking to him, but I don't remember exactly what was said.

. . . .

A. I remember him telling me that I [had an] ectopic pregnancy . . . .

. . . .

Q. Before the surgery that Dr. Bratton did, did Dr. Bratton talk to you about the surgery he was going to perform?

A. I believe so.

Q. What did he tell you about it?

A. I believe he just said, you know, like I said earlier, about having to take the whole tube instead of trying to take the baby and repairing the tube.

Q. Okay.

A. And that it wouldn't – I believe he said it wouldn't take too long or something. I'm – I'm not sure of the whole conversation.
. . . .
Q. Did [Dr. Bratton] have a discussion with you about the potential risks of surgery?

A. I'm not sure what all was said. I'm not – I don't remember.

Q. Well, do you think that probably occurred: There was some discussion about potential risk of the surgery?

_____

[7] We must note that only a portion of Appellant's deposition has been included in the record.

-18-

A. Probably.

Q. Do you remember any of the ones that he mentioned?

A. No.

Dr. Bratton's deposition testimony indicates that on the night of May 16, 2005, he conversed with Appellant for "15 or 20 minutes" and "recommended [Appellant] have a laparoscopy to see what was going on." However, Appellant declined both a CAT scan and a laparoscopy believing the procedures might pose a risk to her unborn child, despite Dr. Bratton's belief that she was notified that her ultrasound revealed no evidence of an intrauterine pregnancy. Concerning the morning of May 17, 2005, Dr. Bratton's deposition testimony reveals that he informed Appellant that "[t]here's evidence of an ectopic." According to Dr. Bratton, after Appellant signed a Consent for Surgery/Special Procedure form, her surgery was scheduled to take place "[p]robably around 2:00[P.M.]" on May 17, 2005, but was delayed until 7:00 P.M. after Appellant consumed food against NPO orders.

Because Appellant has not offered proof of the appropriate disclosures of a general surgeon in the community or a similar community, or that Dr. Bratton departed from such, we uphold the trial court's grant of summary judgment as to Appellant's informed consent claim.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. All other issues raised herein are pretermitted. Costs of this appeal are taxed to Appellant, Beverly Lockard, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-19-